J44HWelA

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          19 Cr. 212 (VEC)

PERRY WELLS, KARL DUNCAN, and
LEO RUSS,

                                        Arraignment and
            Defendants.                 Bail Review

------------------------------x

                                        New York, N.Y.
                                        April 4, 2019
                                        10:00 a.m.


Before:

                 HON. VALERIE E. CAPRONI,

                                        District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
ADAM SLOAN HOBSON
     Assistant United States Attorney

BRADLEY L. HENRY
     Attorney for Defendant Wells

NATALI J.H. TODD
     Attorney for Defendant Duncan

DONALD du BOULAY
     Attorney for Defendant Russ
```

J44HWelA

1          (Case called)

2          MR. HOBSON:  Good morning, your Honor.  Adam Hobson,

3    for the government.

4          THE COURT:  Good morning.

5          MS. TODD:  Good morning, your Honor.  Natalie Todd,

6    for Mr. Duncan who is standing to my right.

7          THE COURT:  All right.  Ms. Todd and Mr. Duncan, good

8    morning.

9          MR. HENRY:  Good morning, your Honor.  Brad Henry, for

10   Mr. Wells, who also is standing to my right.

11         THE COURT:  Good morning.

12         MR. DU BOULAY:  Good morning.  Donald du Boulay, for

13   Mr. Russ, to my right.

14         THE COURT:  Good morning.  All right.  Be seated,

15   everybody.

16         All right.  The first order of business is to arraign

17   the defendants.  So let's see.  Let's start with Mr. Duncan.

18         Mr. Duncan, have you read the indictment in this

19   case --

20         DEFENDANT DUNCAN:  Yes.

21         THE COURT:  -- which is 19 Cr. 212?

22         DEFENDANT DUNCAN:  Yes, your Honor.

23         THE COURT:  Have you discussed it with your attorney?

24         DEFENDANT DUNCAN:  Yes.

25         THE COURT:  How do you plead?

3

J44HWelA

1              DEFENDANT DUNCAN:  Not guilty.

2              THE COURT:  Do you know you're charged in only one

3    count to conspiracy to distribute and possess with intent to

4    distribute drugs?

5              DEFENDANT DUNCAN:  Yes, your Honor.

6              THE COURT:  OK.  Mr. Wells, have you read the

7    indictment in this case?

8              DEFENDANT WELLS:  Yes.

9              THE COURT:  Have you discussed it with your attorney?

10              DEFENDANT WELLS:  Yes.

11              THE COURT:  How do you plead?

12              DEFENDANT WELLS:  Not guilty.

13              THE COURT:  OK.  Mr. Russ?

14              DEFENDANT RUSS:  Yes.

15              THE COURT:  Have you read the indictment in this case?

16              DEFENDANT RUSS:  Yes.

17              THE COURT:  Have you discussed it with your attorney?

18              DEFENDANT RUSS:  Yes.

19              THE COURT:  How do you plead?

20              DEFENDANT RUSS:  Not guilty.

21              THE COURT:  All right.  I met with your codefendants,

22    I think, on Monday, and I've set a schedule.  But just so

23    everybody is sort of on the same page, Mr. Hobson, can you

24    inform these defendants what the nature of the discovery in

25    this case is.

4

J44HWelA

1          MR. HOBSON:  Yes, your Honor.  The discovery consists

2     primarily of wire transcripts.  As I told the Court and the

3     other defendants, the wires are in English, and we will also be

4     providing draft line sheets pursuant to a stipulation that they

5     are, in fact, drafts.  There are about three months of wires

6     over multiple phones.  So about five --

7          THE COURT:  Were you up on any of these defendants'

8     phones?

9          MR. HOBSON:  We were up on Mr. Wells' phone for one

10     month in January.

11          THE COURT:  OK.

12          MR. HOBSON:  The discovery's also going to include

13     some surveillance footage from pole cameras, law enforcement

14     records, and some search warrant applications, although I'm not

15     sure that -- I'm not sure that the search warrants apply to

16     these particular defendants with the exception of maybe

17     Mr. Wells.

18          THE COURT:  Have you figured out yet what you'll need

19     in terms of hard drives?

20          MR. HOBSON:  We don't yet need to know the size, but

21     as I told some of the defense counsel prior to today's

22     conference, once we know the size of the discovery, we'll be

23     requesting flash drives or hard drives so that we can load them

24     and get them copies.

25          THE COURT:  At the prior appearance you indicated that

J44HWelA

1    you thought you could get the bulk of the discovery,

2    essentially all of the wiretaps, done by April 19.  Is that

3    still reasonable?

4              MR. HOBSON:  That's still our expectation.

5              THE COURT:  All right.  What we're going to do is

6    we're going to have a status conference on July the 9th at

7    1:45.  On that date I anticipate setting a trial schedule.  We

8    may set you at a different time.  It's six defendants here

9    earlier?

10             MR. HOBSON:  Yes, a total of nine defendants in the

11   case.

12             THE COURT:  Let me keep you broken into two groups so

13   that we can -- so the marshals don't have a hard time with

14   this.  Is everybody available on July the 9th at 2:15?

15             MR. HENRY:  Yes, your Honor.

16             MS. TODD:  Just a moment, your Honor.

17             MR. DU BOULAY:  Mr. Russ is available.

18             THE COURT:  OK.

19             MS. TODD:  Mr. Duncan is.

20             THE COURT:  Perfect.  I'm going to put you on July the

21   9th at 2:15.

22             In the event that some defendants have pled by then,

23   we'll pick a time that everybody can come if I don't have too

24   many defendants to handle them all in one appearance.  So,

25   basically, the date will be July 9, but the time stays

J44HWelA

1    flexible.  At the July 9 conference, I plan to set a trial

2    date.  My goal is to get this case tried this year.  So

3    probably be in the late fall, early winter.

4           As per the prior appearance, I'm going to exclude time

5    under the speedy trial clock between now and July 9 given the

6    complexity of the case and the number of wiretaps.  That time

7    is necessary for the defense to review the discovery and to

8    formulate your defense.

9           Any objection to me excluding time, Ms. Todd?

10           MR. HENRY:  No, your Honor.

11           MS. TODD:  No, your Honor.

12           THE COURT:  Du Boulay?

13           MR. DU BOULAY:  No, your Honor.

14           THE COURT:  Anything further from the government as to

15    these three defendants?

16           MR. HOBSON:  Other than the bail appeals for Mr. Wells

17    and Mr. Duncan, nothing else.

18           THE COURT:  Mr. Duncan.  That means, Mr. Du Boulay and

19    Mr. Russ, you are excused.

20           Mr. Russ, stay in touch with your lawyer so you know

21    when to come back.

22           DEFENDANT RUSS:  Yes.

23           THE COURT:  The date I set could get shifted.  Just

24    make sure you stay in touch with Mr. Du Boulay.

25           DEFENDANT RUSS:  Thank you.

J44HWelA

1          THE COURT:  All right.

2          Mr. Hobson, why don't we start.  Which defendant do

3  you want to start with?

4          MR. HOBSON:  I think Mr. Duncan might be the easiest

5  to start with.

6          THE COURT:  OK.

7          MR. HOBSON:  Give me just one moment so I make sure I

8  have the pretrial report.

9          Your Honor, with respect to Mr. Duncan, our primary

10 argument and what gives us the most concern about him is that

11 he was committing these offenses while apparently on either

12 parole or probation in two different districts -- or two

13 different jurisdictions, New York State and in the state of

14 Connecticut.  Because he was -- those were related to prior

15 drug distribution offenses.  Obviously, being under the Court's

16 supervision there did nothing to stop him from continuing to

17 conspire with others to distribute drugs.  He and his

18 codefendant Sylvestre Mahon were seen on multiple occasions

19 driving from Connecticut to Mr. Watson's house in Queens to

20 pick up drugs and drive back to Connecticut where they

21 presumably distributed those drugs.  It is hard to imagine that

22 when being subject to probation in two jurisdictions did not

23 stop him from continuing to deal drugs, that an additional

24 pretrial supervision would prevent him from doing so.

25          In addition, one of the conditions of his release that

J44HWelA

1    Judge Parker imposed -- and I understand why she did it.  I

2    think it was reasonable if you were going to allow him to be

3    out -- was that he could not continue his employment at the

4    restaurant where he was working because that's a restaurant

5    owned by his codefendant Mr. Mahon and his fellow drug dealer

6    Mr. Mahon.  The one problem with that, of course, is that it

7    now leaves the defendant without employment, and I think he is

8    even more likely to continue selling drugs since that was his,

9    apparently, primary source of income.

10          So because of that, we really are not comfortable with

11   him being out.  We don't think we can reasonably assure the

12   safety of the community.  Obviously, there's also some risk of

13   flight too from someone who does not respect court orders, but

14   I think our primary argument is danger to community.

15          THE COURT:  Was he captured on the wiretap?

16          MR. HOBSON:  He was.  Most recently in January there

17   were -- January 6 and January 7 there were calls organizing a

18   200 gram deal with Mr. Watson.  That was followed by

19   surveillance of him coming to Mr. Watson's house.  And on

20   January 10, there were also calls between Mr. Duncan and

21   Mr. Watson discussing money for drug sales.

22          THE COURT:  How much money?

23          MR. HOBSON:  In that case it was $6,150.

24          THE COURT:  OK.  Ms. Todd.

25          MS. TODD:  Thank you, your Honor.

J44HWelA

1          I don't believe the government has satisfied its

2     burden.  I do believe that --

3          THE COURT:  Actually, let's just level set.  So the

4     government -- this is a presumption case.

5          MS. TODD:  Right.

6          THE COURT:  So the government has satisfied its burden

7     because it's got a presumption.  So the burden's on you.

8          MS. TODD:  So, Judge, the standard of danger to the

9     community is clear and convincing evidence that there are

10    absolutely no conditions that will reasonably assure the

11    defendant's -- safety of any other person in the community.

12    And with respect to risk of flight, the standard is

13    preponderance of the evidence.

14         THE COURT:  Stick with danger to the community.  This

15    man has no real ties anywhere else.  I don't see him as a

16    particular risk of flight.  Not saying it's zero, but it's

17    pretty low.

18         MS. TODD:  Thank you, Judge.

19         So to find danger by clear and convincing evidence,

20    there must be proof based on Second Circuit well-established

21    law which supports the conclusion to a high degree of certainty

22    that if released he's a real danger to the community, and that

23    is *United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985).

24    Mr. Duncan does not appear to be a leader of this alleged

25    conspiracy, he is not in possession of firearms, nor is he

1    alleged to be using firearms in furtherance of the conspiracy.

2    The Pretrial Services Department, which I believe is in the

3    business of managing people on supervision, believes that they

4    can manage him and that they can put in place strict pretrial

5    conditions that will control his movements.

6          With respect to his criminal history, Judge, the

7    government indicates that he is on two probations, and I'm

8    assuming that because the conspiracy began in 2016, during

9    which time he was on probation, that they're indicating that he

10   was committing crimes then.  I don't know when Mr. Duncan

11   joined the conspiracy.  I think that will be determined down

12   the road.  But I can tell the Court that at all times while he

13   was on probation, misdemeanor probation, he completed those

14   probation terms without incident.  So it's clear that he can

15   follow the Court's order to do what he is told.

16         THE COURT:  Well, hang on.  Let me push back on that.

17   According to Pretrial Services' report, his conviction in 2013

18   in New York State gave rise to a sentence of three years of

19   probation.  That probation was ended on February 22, 2019.

20         MS. TODD:  Correct.

21         THE COURT:  According to the government, he was

22   intercepted in January of 2019 arranging to pick up 200 grams

23   of cocaine from Mr. Watson and then discussing a couple of days

24   later bringing or delivering 6,000-plus dollars.  So that

25   probation, assuming that the government's presentation is

J44HWelA

accurate, would seem, although he didn't get caught during the

term of the probation, that would seem to be violated.  And

then I gather he's currently on probation from a November 2017

conviction in Connecticut.

MS. TODD:  That is correct.

THE COURT:  That was three years of probation, so he's

still on that probation.

MS. TODD:  He's still on probation, and the Court is

correct in that.  I have not seen the line sheets.  I don't

know what the language is that was used in those discussions.

The government assumes that it's drug-related.

THE COURT:  They're talking $6,000, and he was talking

to somebody who they've been up on and they have reason to

believe and, indeed, a grand jury has indicted for crack

dealing.  So I think it is reasonable for the Court to

conclude, based on the proffer of the government, that that

conversation was a drug-related conversation.  And they

surveilled him driving from Connecticut to a house in Queens

and then leaving with a package.

MR. HOBSON:  Yes, your Honor.

MS. TODD:  Judge, I'm not going to concede -- I hear

what the Court is saying, but I cannot concede that not having

seen the evidence.

THE COURT:  I completely understand.  Here's my view.

I've got a defendant who in a presumption case there's evidence

J44HWe1A

1    that he committed this crime while under court supervision.  To

2    me that -- it's a very difficult road for you to hoe to say he

3    is not a danger to the community in the sense that he's going

4    to comply with the terms and conditions of pretrial release

5    when, by all indication, he had failed to comply with the terms

6    of two different courts' probation requirements.

7              MS. TODD:  Judge, what I'm suggesting to the Court is

8    that this is his first federal supervision, which is going to

9    be incredibly more stricter than he's been ever allowed to be

10   on any other prior state supervision.  And the Court's

11   admonishment that he not be in any contact with codefendants

12   and electronic bracelet, I think it's a very different posture

13   that we're in with respect to the federal and the state

14   supervision.  He reports to his probation however infrequently

15   in state.  They don't have the close monitoring that they do

16   here.  I just don't see why -- a strict release condition would

17   overcome any issue of danger with respect to Mr. Duncan.  As

18   the Court recognized with everything else, he is -- this is not

19   his only source of income.  He actually was employed.

20             THE COURT:  Well, he had been employed for a short

21   period of time, but based on the magistrate's -- the order

22   that's being appealed, he's required to terminate that

23   employment, so that would again make him unemployed.

24             MS. TODD:  Judge, he can find employment.  He is a

25   barber by trade.  He's got skills.  And in addition to working

J44HWelA

1    at the restaurant, he also cut hair.  Prior to that he worked

2    at the Mayonnaise barbershop.  So he had legitimate employment.

3    I don't think this is an individual with absolutely no skills.

4    And even if he did it such that he couldn't find employment, it

5    just might be a little more difficult if he is on the home

6    detention, and he would have to get approval through probation

7    to -- with respect to his movements and his comings and goings.

8            But I do believe, Judge, that he is not considered the

9    worst of the worst.  He's not a leader.  He's not a manager.

10   He is, I would consider, low level based on what was

11   represented at the earlier presentation to the Court.  He

12   certainly can be managed.  Judge, I think there are conditions

13   that can be put in place, real strict conditions that would

14   assure the safety of the community.

15           THE COURT:  OK.  Let me hear about the other

16   defendant, Mr. Wells.

17           MR. HOBSON:  Yes, your Honor.  Again, with Mr. Wells,

18   our primary argument is danger to the community given the

19   volume of crack that he appears to have been distributing based

20   on our investigation.  Again, to remind the Court, Mr. Wells is

21   one of the defendants whose phone we were actually up on in

22   December and January.  I'm going to highlight just a few of the

23   transactions, the drug transactions, that we saw Mr. Wells

24   being involved in --

25           THE COURT:  OK.

1          MR. HOBSON:   -- by some wires and surveillance.

2          On May 30, 2018, based on an intercepted call on

3     Watson's phone, we heard the men discussing a deal for

4     approximately $18,200 -- or for $18,200, which equates to

5     approximately 480 grams of crack at the $38 price that Watson

6     was quoting at the time.

7          On June 11, 2018, there were discussions about a

8     $16,800 transaction which would equate to approximately

9     440 grams of crack.

10          On December 15, 2018, and this was when we were up on

11     Wells' phone itself, there was a call where -- and I referred

12     to this the other day -- Mr. Wells, before the call picked up,

13     was heard talking to another individual.  And while many of

14     the -- in many of the calls Mr. Wells uses code to refer to

15     drug transactions, because he was talking to an individual in

16     his presence, he did not think to use code.  And in this

17     conversation, he actually was pretty explicit about his process

18     for turning powder cocaine into crack by cooking it.  This is

19     where he says:  "I put three on when I whip it up.  When I whip

20     it up again, I put on another three, and then I put on another

21     three.  I probably do 100 grams, because I got a lot of coke."

22     So there's not really an argument for Mr. Wells that he's not

23     talking about cocaine.

24          December 25, 2018, we intercepted a call between

25     Watson and Wells.

J44HWelA

1          THE COURT:  I'm sorry.  What was the date?

2          MR. HOBSON:  December 25, 2018.

3          THE COURT:  Christmas Day.

4          MR. HOBSON:  Christmas Day.  We intercepted a call

5    where Watson was explaining to Wells that the price had gone up

6    to $40 per gram of crack.

7          THE COURT:  Watson told Wells?

8          MR. HOBSON:  Watson told Wells that.

9          THE COURT:  The price was up?

10         MR. HOBSON:  Yes.  On January 11, 2019, we intercepted

11   calls between Wells and a customer.

12         THE COURT:  I'm sorry.  Give me that date again.

13         MR. HOBSON:  January 11.

14         THE COURT:  I'm sorry.  The price going back to the

15   Christmas?

16         MR. HOBSON:  Christmas was when the price was going up

17   to $40.

18         THE COURT:  Price went up to $40 a gram.  $40 a gram

19   of powder?

20         MR. HOBSON:  That's of crack.

21         THE COURT:  That's of crack.

22         MR. HOBSON:  It had previously been $38.

23         THE COURT:  Got it.  So January 11.

24         MR. HOBSON:  January 11 was a call between Mr. Wells

25   and a user, one of his customers.  We surveilled that.  We then

J44HWelA

surveilled Mr. Wells.  We watched that customer go to him and

then leave him.  We then arrested that customer and found him

in possession of crack, showing that, in fact, Mr. Wells was

discussing crack sales on these calls.

        THE COURT:  OK.

        MR. HOBSON:  Just to give you a sense of -- I'm not

going through all the conversations we intercepted from

Mr. Wells, but to give you a sense of the volume, we were up on

his calls for one month, and he had 26,000 sessions over his

line.  That's a very large number of sessions.  It's sometimes

hard to tell exactly what a session is because a text message

can be a session and a long call can be a session.  But it's

certainly more sessions than I am used to seeing on a phone

even when we are up on texts, and a large number of those

sessions were drug-related.

        So because of that, Mr. Wells seem to be moving a very

large volume of crack.  The evidence against him is very

strong, and we believe that he continues to pose a danger to

the community.  I will note that this is not his first offense.

He has multiple convictions for distributing drugs; and,

obviously, those prior convictions have not deterred him from

continuing to distribute.

        THE COURT:  Am I right that you -- is he the one that

ammunition was found, or am I confusing him with a different

defendant?

J44HWelA

1          MR. HENRY:  That's a different defendant, your Honor.

2          THE COURT:  Different defendant.

3          MR. HOBSON:  I think it is a different defendant, your

4     Honor.  I can't remember offhand what was found with Mr. Wells.

5          THE COURT:  That was Mr. Duncan.

6          MR. HENRY:  That's correct.  Nothing was found in the

7     search of Mr. Wells -- of a residence, I guess, related to

8     Mr. Wells except, I guess, the government in their prior

9     proffer alleged that there was drug residue in this place they

10    searched connected to Mr. Wells.

11         THE COURT:  OK.  We'll come back to Mr. Duncan and the

12    ammunition.

13         So Mr. Wells -- I'm sorry.  What was -- the issue with

14    Mr. Wells is there seems to be a dispute about where he lives.

15    The government indicated that you searched the basement, I

16    think, apartment at 210-04 115th Avenue, and the defendant

17    represents that he lives with his mother and his brother at

18    134-15 166 Street.

19         MR. HOBSON:  That's right, your Honor.  We had

20    observed the defendant selling out of the residence that we

21    searched multiple times.

22         THE COURT:  That's the 115th Avenue apartment?

23         MR. HOBSON:  Yes.  That's where we observed him in

24    connection with that DOI I referred to where we then arrested

25    the customer.  So I don't know whether he was also residing

J44HWelA

1    somewhere else and merely using that residence that we searched

2    not so much as a residence but as a base of operations, I just

3    don't.  I did not know about the other house until the pretrial

4    report.

5              THE COURT:  What was found at the 115th Avenue

6    apartment?

7              MR. HOBSON:  I do recall that there was residue found

8    on the counter that appeared to be drug residue, but we have

9    not yet gotten the lab results.

10             THE COURT:  You don't have the lab report.

11             All right.  Mr. Henry.

12             MR. HENRY:  Thank you, your Honor.

13             Recognizing this is a presumption case and we have to

14   overcome that presumption, I think there are many reasons why

15   we have and will continue to overcome the presumption.

16             The Court's aware of the conditions that the

17   magistrate judge put in place.  I think those conditions are

18   sufficient, number one, to overcome the presumption and, two,

19   to prevent my client from being a danger to the community.  The

20   question about bail and the question about guilt or innocence

21   or two different scenarios.  The reason for that is very

22   simple.  But for the presumption, the default position in the

23   Bail Reform Act is that a person should be placed on bail for

24   lots of reasons, including cost, premature punishment, and many

25   other reasons.

J44HWelA

1              In this situation with Mr. Wells, the government

2       alleges a number of facts about his conduct during that period

3       of time.  It's difficult for us to dispute that at this point.

4       So we assume that those things are true for purposes of the

5       hearing, just as the Court said earlier.  What I will say is

6       it's our intention, obviously, to contest those vigorously.

7       But at this juncture, whether or not Mr. Wells was selling or

8       dealing with or involved in a conspiracy with crack cocaine,

9       there is no reason why he cannot be placed on bail, held to

10      account for being where he is supposed to be to keep him from

11      continuing to undertake that activity, and get him back to

12      court when he's supposed to be here.

13              I recognize the government's main argument is danger,

14      so I won't go into risk of flight for the reasons you alluded

15      to earlier.

16              Mr. Wells does have a criminal history, and so I'll go

17      ahead and knock that out early.  The thing that we can take

18      away from the criminal history, right, unlike some of his

19      codefendants, is that Mr. Wells during the period of time that

20      he was facing those criminal justice charges appeared in court

21      when he was supposed to, did not continue to violate the

22      conditions either of his bond at the time and/or of his

23      probation and/or sentence or parole.  He completed those

24      without fail one after the other.  So we know that he can

25      comply with the rules of the Court without exception.

J44HWelA

1          THE COURT:  Although I would note that he was

2     discharged from parole on March 25, 2008, and his next

3     conviction is less than -- or right at six months later, in

4     October 2008.

5          MR. HENRY:  That's true, your Honor.  I understand

6     your position, but there is no indication in court records that

7     he -- it could be that he came off of probation and/or parole

8     and sort of right back into doing it, but during the period of

9     time when he was under supervision, he was doing what he was

10    supposed to do.  And that's the whole point of whether you get

11    bond or not, can we keep you in a place where you're not a

12    flight risk and you're not a danger to the community while we

13    figure everything out?  And I think there's a way to do this.

14         We've suggested this difference between the place

15    which was searched and the place within which Mr. Wells lives

16    and will live during this period of time.  There is no

17    indication that there was any drug activity, any involvement

18    with any kind of a customer or anything like that at the

19    address where he will go.  His mother -- he has a number of

20    family members here.  His mother, Ms. Wells, Rose Wells, is

21    here.  She will be with him and will ensure -- and, in fact, I

22    talked to her this morning.  In addition to the other things

23    that the magistrate judge ordered, she is willing to sign on as

24    a third-party custodian.  I've talked to her about her

25    reporting obligations.  That if Mr. Wells didn't do what he was

J44HWelA

1      supposed to be doing, she would have to turn her son in.  She

2      had no issue with that.  She felt very comfortable with the

3      idea of doing that, and she said Mr. Wells respects her and

4      will do what she tells him to do.  I think that's true.  In my

5      interactions with Mr. Wells, he seems level headed.  He doesn't

6      seem like the kind of individual that would go out and do

7      something off the rails.

8              We have a bond put into place.  He would be living

9      with his mother.  His brother, who also lives in the home, is

10     here, his older brother.  He would be living in the home as

11     well.  He's a lifelong resident.

12             THE COURT:  That goes to flight.  I'm not concerned.

13     Again, there may be a minimal risk of flight, but it is

14     minimal.  Can you address, as I read the presentence report --

15     yes, the presentence services report -- he has several orders

16     of protection.  What's the story?

17             MR. HENRY:  So Mr. Wells has -- I don't know.  Give me

18     just one second, your Honor.

19             (Defendant conferred with counsel)

20             MR. HENRY:  Your Honor, my understanding from

21     Mr. Wells, Mr. Wells has a number of children from a few

22     different ladies throughout the course of history.

23     That obviously -- relationship issues sometimes spiral out of

24     control.  It's my understanding the particular incident these

25     orders of protection stem from related to one girl in

J44HWelA

particular.  It was just a lot of back and forth between those

two.  There were allegations of vandalism to a car that those

orders of protection -- some of those orders of protection stem

from.  They didn't involve violence in terms of violence

towards the individual.  And he's never been charged with that

typically.  If there is violence involved in an order of

protection, a domestic violence report and arrest typically

accompanies that.  So we can assume that these are orders of

protection in which a party outside the presence of Mr. Wells

and without a police report went to the place where you make an

application for those kinds of things and made a report.

So those were issued.  The very specifics of those,

frankly, I don't know.  But it's clear that there are

allegation.  There are no allegations and certainly no charges

of violence of any kind in Mr. Wells' past.  There were no

guns.  There is no ammunition.  There is no allegation that he

is a violent person or engaged in violent activity.

THE COURT:  Now, the orders of protection are

disconcerting.  And from the safety of the community

perspective, drug dealing is one of the things we're supposed

to be guarding against.

MR. HENRY:  Certainly.  I understand, your Honor.

Unless the Court has any other questions, the other things I'll

note, he had a car accident a number of years ago and received

a decent size settlement.  He has $20,000 approximately in the

J44HWelA

1    bank.  $20,000 is essentially what is left over that he kind of

2    lives off of for that car accident.  So to the extent that he

3    doesn't have a job and will be on home incarceration, he has

4    money to help support his mother, pay bills, pay rent, and do

5    those kinds of things.  So he won't be out hunting for other

6    ways to snatch up money.  He'll be able to support himself in

7    that way.

8         THE COURT:  Well, he's had that money for some period

9    of time, and it didn't seem to deter him from doing things

10   that, based on the proffer of the government, makes it appear

11   that he was supplementing his income by selling crack cocaine.

12        Tell me again what was found in the apartment.  It was

13   just residue?

14        MR. HOBSON:  Just residue.

15        THE COURT:  And that's in the apartment, the other

16   apartment, not the apartment that he says he was living at?

17        MR. HOBSON:  That's right, your Honor.

18        THE COURT:  Based on your conversations with the

19   agents, do you have any reason for me to believe that, in fact,

20   he was living in that apartment and not with his mother?

21        MR. HOBSON:  We had surveilled him there multiple

22   times, and I believe we also had GPS monitors on his phone as a

23   result of the wire and saw him there multiple times.  That's

24   certainly where we thought he was both living and dealing.  I

25   don't know the details of how often he was there versus the

J44HWelA

1    other location.

2              THE COURT:  OK.  What's the situation in the

3    apartment, the 166th Place apartment?  How many bedrooms are

4    there?  There are three adults living there now, right?

5              MR. HENRY:  It would be his mother, his older brother,

6    and then, obviously, Mr. Wells.

7              (Defendant conferred with counsel)

8              MR. HENRY:  So, as a practical matter, your Honor,

9    it's a one-bedroom.  His mother lives in the bedroom.  They

10   have another sleeping/living area set up in a part of the

11   living room, and his brother has a girlfriend essentially very

12   close.

13             THE COURT:  There are four people living in a

14   one-bedroom apartment?

15             MR. HENRY:  No, the brother will go up.  The

16   girlfriend lives in the building in a different apartment, so

17   he will stay with the girlfriend.

18             THE COURT:  He's going to displace his brother?

19             MR. HENRY:  I think the brother's displaced himself

20   previously anyway.  He as a regular course goes and sleeps and

21   stays with his girlfriend.

22             THE COURT:  In fact, the people that are going to be

23   residing in this apartment are the defendant and his mother?

24             MR. HENRY:  That's correct, on a day-to-day,

25   100 percent of the time basis, yes.

J44HWelA

1          THE COURT:  The proposal is that he's under home

2     incarceration, monitored home incarceration?

3          MR. HENRY:  Correct.

4          THE COURT:  With a bracelet?

5          MR. HENRY:  Correct.

6          THE COURT:  Who are the two signatories on his bond?

7          MR. HENRY:  So we have a number of signatories who are

8     willing to sign.  His mother, his daughter Kayla, grown

9     daughters are willing to sign.

10          THE COURT:  Are his daughters employed?

11          MR. HENRY:  They are.

12          THE COURT:  What do they do?  Are they here?

13          MR. HENRY:  They are not here.  They're at work.

14          (Defendant conferred with counsel)

15          MR. HENRY:  So Mr. Wells' ex-wife, Crystal, and the

16     two daughters that are -- one daughter that's -- the daughter

17     from that union, they run essentially a nursing elderly

18     facility together.  They're both administrators of that

19     facility.  The ex-wife owns it, and the daughter works in the

20     administration of that.

21          THE COURT:  What's the daughter's name?

22          MR. HENRY:  Kayla Wells.  We attempted to set Crystal,

23     his ex-wife, and Kayla up for interviews with the government,

24     because they didn't appear, we obviously held off on that.

25          THE COURT:  You indicated his mother is also prepared

J44HWelA

1    to sign the bond?

2              MR. HENRY:  She is as a third-party custodian.  She

3    would also sign the bond as a signatory to the monetary amount.

4    I'll say, obviously, she's not working.  She's retired.

5              THE COURT:  What are the obligations of a third-party

6    custodian?

7              MR. HENRY:  A third-party custodian is to watch over

8    Mr. Wells, ensure that he's complying with the terms and

9    conditions.  She would be informed about what the terms and

10   conditions of the bond are, including staying in the home at

11   all times, even though he would be guarded electronically; and

12   that if he violates any of those terms and conditions of bond,

13   it's her responsibility and her duty under penalty of

14   additional criminal penalty against her to report him to

15   pretrial.

16             THE COURT:  Is his mother here?

17             MR. HENRY:  She is.

18             THE COURT:  Wave your hand.  You understand what

19   you're agreeing to?

20             A VOICE:  Yes.

21             THE COURT:  You understand that if your son -- if

22   people start coming to that apartment, that you've got to find

23   out why they're there; and if he's selling crack to them,

24   you've got to call the Pretrial Services, and he's going to be

25   arrested?

J44HWelA

1           A VOICE:  Yes.

2           THE COURT:  If you fail to do that, you're going to be

3     arrested?

4           A VOICE:  Yes.

5           THE COURT:  All right.  I'm not going to reverse the

6     magistrate's decision as to Mr. Wells.

7           MR. HENRY:  Thank you, your Honor.

8           THE COURT:  The suretors still need to be interviewed,

9     but I think that that set of conditions overcomes the

10    presumption.

11          Mr. Wells, your mother's on the line.  Don't think

12    that the government will not take her into custody if she fails

13    to call the police if you start committing crimes out of that

14    apartment.  You're on home arrest.  You can't leave.  You can't

15    diddle around outside.  You can go see your lawyer.  You've got

16    to clear all that with Pretrial Services when you're out of the

17    apartment.  Understand that?

18          DEFENDANT WELLS:  Yes.

19          THE COURT:  You violate the terms of your pretrial

20    release, I will remand you.  You understand that?

21          DEFENDANT WELLS:  Yes.

22          THE COURT:  Yes.

23          MR. HOBSON:  I was going to address what you wanted to

24    address on Mr. Duncan, which was the box of ammunition found at

25    his arrest.

J44HWelA

1          THE COURT:  Yes.

2          MR. HOBSON:  I apologize for not raising that.  He

3    consented to a search of his apartment, and the agents found a

4    box of ammunition which, obviously, would have also been a

5    violation of his probation and federal law because he was a

6    convicted felon.

7          THE COURT:  What was the -- do you happen to know what

8    type of ammunition it is?

9          MR. HOBSON:  I actually just asked the agent, and I

10   have not heard back.

11         THE COURT:  OK.  Ms. Todd.

12         MS. TODD:  First, Judge, my client did not consent to

13   a search.  That's a matter that we'll deal with.

14         THE COURT:  We can deal with that on another time.

15         MS. TODD:  It's my understanding that ammunition was

16   indeed found inside the apartment somewhere in a closet.  It's

17   also my understanding that you can simply go to Walmart in

18   Connecticut and buy bullets.  I don't know --

19         THE COURT:  He can't, because he's a felon.  He's not

20   supposed to.

21         MS. TODD:  A state felon.  My understanding, Judge, is

22   that when he was put on felony probation, he was asked to

23   surrender any weapons, if he had any, which he did not.  There

24   was no mention of any ammunition.  I don't know -- I don't know

25   what the terms of that was, whether or not it was outlined,

J44HWelA

1    delineated for him so that he was on notice that as a convicted

2    felon, he is not -- cannot possess bullets.

3              THE COURT:  OK.  Ms. Todd, help me out with why

4    someone would have bullets if they don't have a weapon.

5              MS. TODD:  I don't know, Judge.

6              THE COURT:  I don't know either.

7              MS. TODD:  I don't know.

8              THE COURT:  I don't know either, but I'll tell you

9    what.  I'm going to overrule Magistrate Judge Parker as to

10   defendant Duncan.  I think the things that persuade me that you

11   have not overcome the presumption is, one, that there were

12   bullets found in his apartment and, second, that he committed

13   this crime -- or there's probable cause to believe he committed

14   this crime while he was on probation and parole release, and

15   that leads me to conclude that we cannot -- I cannot guarantee

16   the safety of the community by a set of conditions on his

17   release.

18             If, as you review the discovery in this case, it

19   appears that the government has overstated their evidence

20   against Mr. Duncan, please feel free to reraise the issue.  I'm

21   happy to consider it again if there's additional evidence that

22   you can provide.

23             Anything further from the government?

24             MR. HOBSON:  No, your Honor.

25             THE COURT:  Anything further from the defense?

J44HWelA

| | |
|---|---|
| 1 | MR. HENRY:  No.  Thank you, your Honor. |
| 2 | THE COURT:  All right.  Thank you all.  I will see you |
| 3 | all in September -- sorry, July. |
| 4 | MS. TODD:  Your Honor. |
| 5 | THE COURT:  Yes. |
| 6 | MS. TODD:  I think Mr. Duncan wishes to address the |
| 7 | Court. |
| 8 | THE COURT:  That was fast. |
| 9 | OK.  You're going to address me? |
| 10 | You have advised him? |
| 11 | MS. TODD:  I have advised him that anything he says -- |
| 12 | THE COURT:  Anything you say can be used against you, |
| 13 | Mr. Duncan. |
| 14 | MS. TODD:  But Mr. Duncan is expressing |
| 15 | dissatisfaction with my representation, so I thought I'd raise |
| 16 | it now, since we're in the preliminary stage. |
| 17 | THE COURT:  Move the mic so I can hear. |
| 18 | DEFENDANT DUNCAN:  You want me to stand? |
| 19 | THE COURT:  No, you're fine.  Just speak into the |
| 20 | microphone so we can all hear you. |
| 21 | DEFENDANT DUNCAN:  I feel like she didn't represent me |
| 22 | to the best of her ability.  I never met with her to speak |
| 23 | about my case prior to this.  Everything is being rushed upon |
| 24 | me right now, writing on a pad in front of me.  I'm not guilty. |
| 25 | THE COURT:  OK.  So you've pled not guilty, |

J44HWelA

1    Mr. Duncan.

2              DEFENDANT DUNCAN:  Yes.

3              THE COURT:  Here's what I want you to do.  To the

4    extent that you're asking for new counsel, I'm not going to

5    give you a new counsel at this time.  Ms. Todd is a perfectly

6    capable lawyer.  I hear your frustration.

7              Meet with Mr. Duncan.  This is a new case.

8              She ably presented the arguments.  The problem that

9    you've got on bail with me is that this crime was committed

10   when you were on probation.  So you were already under a super

11   obligation not to commit other crimes.  Second is you've got

12   ammunition in your apartment.  There is no reason to have

13   ammunition in an apartment if you don't have a weapon

14   somewhere.  That's just a waste of money.  You might as well

15   take out money and set it on fire if you're buying ammunition

16   and you don't have a gun.

17             So all of that adds up to the defense, your side, has

18   not overcome the presumption.  There's a presumption in federal

19   court if you're charged with a narcotics offense that you will

20   be detained.  The magistrate judge thought the defense had

21   overcome the presumption.  It comes to me.  I don't think your

22   side has overcome the presumption.  If there's other evidence

23   that you think should be presented, as I told your attorney,

24   this is without prejudice.  She can reraise the issue.  If

25   you're still -- if you continue to be dissatisfied with

J44HWelA

Ms. Todd, we can discuss it in the future.  For today what I
want you to do is to consult with your attorney.  If there's
more information that you think should be brought to my
attention, all she has to do is call chambers.  I'll bring you
back.  But for now, I want you to stick with Ms. Todd.
Ms. Todd is a perfectly capable lawyer.

        Let me just tell you, generally on CJA attorneys, when
people are unhappy with their lawyers, I will let that -- let
you switch once, but that's it.  So the risk is that while you
may be unhappy with Ms. Todd right now, the next lawyer you get
you like even less.

        DEFENDANT DUNCAN:  I understand.

        THE COURT:  OK.  But we don't switch again.

        DEFENDANT DUNCAN:  I understand.

        THE COURT:  You understand that?

        DEFENDANT DUNCAN:  Yes.  I didn't live in that
apartment alone.

        THE COURT:  OK.  Look, here, Mr. Duncan, seriously,
anything you say can be used against you.

        DEFENDANT DUNCAN:  I understand.

        THE COURT:  I hear you that you didn't live there by
yourself.  That may well influence discussions that Ms. Todd
wants to have with you or Ms. Todd wants to have with the
government.  For now what I urge you to do is talk to your
attorney in a privileged conversation.  If there's more that

J44HWelA

1    needs to be presented to me, it can be done subsequently.  OK?

2              DEFENDANT DUNCAN:  Yes, your Honor.

3              THE COURT:  All right.

4              MS. TODD:  Judge, I just want to say one thing for the

5    record to be clear.  I met with Mr. Duncan on the day of

6    arraignment for an extraordinarily long period of time.  I met

7    him during the pretrial interview and subsequently thereafter.

8              THE COURT:  Well, continue to meet with him.

9              Again, Mr. Duncan, if you continue to be dissatisfied

10   with your attorney, all he need to do is tell her that.  She'll

11   ask you to be brought back in here, and we'll discuss it.  I

12   urge you not to do anything hasty.  That's my advice to you,

13   OK?  Talk to Ms. Todd.  Let her talk through these issues.

14   Again, if you still want to change your attorney, then you can

15   come back in front of me, and we can discuss it at that point.

16   But I don't want to do it right now, OK?

17             DEFENDANT DUNCAN:  Thank you.

18             THE COURT:  All right.  Thank you all.

19             (Adjourned)

20

21

22

23

24

25